# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# STATESVILLE DIVISION
# CRIMINAL CASE NO.: 5:13-cr-32

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | ORDER |
| LEONARD CHARLES BERNARD, ) | |
| Defendant. ) | |

**THIS MATTER** is before the Court upon Defendant Leonard Charles Bernard's ("Bernard") Motion for a New Trial, filed on November 22, 2013. (Doc. 42.) The United States filed a Response on January 15, 2014 (Doc. 50), Bernard filed a Reply on February 7, 2013, (Doc. 51), and the United States filed a Reply on February 27, 2014. (Doc. 52.) On May 19, 2014, the United States filed a document correcting its response, (Doc. 53), and Bernard responded by filing a motion for an evidentiary hearing on June 4, 2014. (Doc. 54.)

On November 14, 2013, Bernard was tried before a jury on charges of Possession with Intent to Distribute Marijuana and Possession of a Firearm in Furtherance of a Drug Trafficking Offense. On November 18, 2013, the jury returned a guilty verdict as to both charges.

Bernard's request for a new trial is based on alleged violations by the United States of "orders of this Court," "obligations under Federal Rule of Criminal Procedure 16, *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. U.S.*, 405 U.S. 150 (1972); and the resulting

impairment of [Bernard's] rights under" the Fifth and Sixth Amendments to the United States Constitution.[1] (Doc. 41 at 1.)

## I. BACKGROUND[2]

On December 4, 2012, Trooper Willis with North Carolina Highway Patrol conducted a traffic stop on Bernard's vehicle on Interstate 40 in Iredell County, North Carolina. (Doc. 50 at 2.) A consensual search of Bernard's vehicle produced approximately a kilo and a half of marijuana, individually packaged in approximately equal amounts, and three firearms. (*Id.*) Bernard was federally indicted for Possession with Intent to Distribute Marijuana and Possession of a Firearm in Furtherance of a Drug Trafficking Crime. (*Id.*)

On September 18, 2013, defense counsel sent a discovery request to the government that asked for all "dispatch and call logs from the date of offense" for the arresting officer (Trooper Willis) and "all the responding backup officers" (Trooper Blanton and Sgt. Crater.) (Doc. 47-4 at 7.) The next day, the attorney for the government forwarded defense counsel's discovery request to the ATF agent who was the primary point of contact with state law enforcement personnel. (*Id.*); (Doc. 50 at 7.) That same day, the ATF agent forwarded the email chain containing the discovery request to Sgt. Crater (*id.*), and Sgt. Crater responded that he did "not think any calls were generated or (*sic*) communication center that day" and that he had spoken with the communications center supervisor who advised that "they would not have any call logs from that far back." (*Id.* at 6.) The attorney for the government then forwarded this entire email chain to defense counsel at 2:51 PM on September 19, 2013. (*Id.*) (Stating: "[a]pparently there are no call

---

[1] Each of these alleged violations stem from the central claim that the government violated obligations pursuant to *Brady* and *Giglio*. (*See* Doc. 50 at 13.) ("Defense counsel cites several sections of this district's Standard Discovery Order which essentially recite discovery obligations already required by *Brady*, *Giglio*, and Federal Rule of Criminal Procedure 16.")

[2] These facts are limited to those relevant to Bernard's Motion for a New Trial and are presented in chronological order.

logs. See below.") Discovery requests for the responding officers' communication logs arose again in an email request on October 22, 2013, when defense counsel asked for the "cell phone records" of the officers. (*Id*. at 3.) The attorney for the government responded that she did not "request the cell phone records of the officers, and they are not part of my file." (*Id*. at 2.) Defense counsel responded: "[i]f you don't have their records, then I will need the cell phone number they had on the date of offense. They should be able to get that to you." (*Id*. at 1.) The government attorney replied: "I don't have that information. You're more than welcome to contact the officers." (*Id*.)

On October 30, 2013, government attorneys had their first substantive meeting with Troopers Willis and Blanton to prepare for trial. (Doc. 50 at 11.) During this meeting, Troopers Willis and Blanton recalled for the first time that Bernard had made additional incriminating statements regarding the marijuana while in the magistrate's office following his arrest. (*Id*.) These statements did not appear in the Troopers' police reports or in the case file. (*Id*.) Defense counsel was informed of this new evidence by email the next day. (Doc. 50-8 at 1.) The contents of that message are reproduced below:

> […]
>
> Also, we meet (*sic*) with Troopers Willis and Blanton yesterday. Trooper Willis said that in addition to the other comments made by the defendant en route to intake, the defendant said that he was going to sell the marijuana for $500 per ounce; he could sell it for more money on the east coast. Trooper Blanton said that while at the magistrate's office, the defendant admitted to growing the marijuana, but said that his operation was not big
>
> Let me know if you have any questions.

(*Id*.) Defense counsel did not follow up with any questions. (Doc. 50 at 11.)

On November 2, 2013, Bernard filed an *ex parte* motion for issuance of subpoenas *duces tecum* requesting "any and all cellular phone records for the state issued cell phones of Trooper

Willis, Trooper Blanton and Sgt. Crater, on December 4, 2012, the date of offense." [3] (Doc. 26 at 1.) The motion was granted by this Court on November 4, 2013. (Doc. 28.) Defense counsel states that by the time of trial the subpoena had only resulted in partial records[4] indicating "extensive communication between at least two of the Troopers prior to Mr. Bernard being stopped." (Doc. 47 at 6-7.) Defense counsel did not raise any objections to the Court or request a continuance based on these partial phone records.

At a suppression hearing held before this Court on November 13, 2013, Trooper Willis testified that the back-up officer, Trooper Blanton, had stopped to refuel his patrol car prior to arriving at the location where Bernard had been pulled over. Defense counsel was not aware of this fact prior to the suppression hearing.

In a Response to Defendant's Motion for a New Trial, the attorney for the government states that that the Troopers responded in the negative when asked prior to trial if their cell phone records contained anything favorable to Defendant or anything of interest to defense counsel, and other standard *Giglio* questions.[5] (Doc. 50 at 8.)

## II. ANALYSIS

---

[3] The requested material included "historical call data, call detail (incoming and outgoing), caller identification(s), and cellular site information including GPS records for the requested phone numbers." (Doc. 26 at 1.)

[4] "These records did not indicate which phone number was assigned to which Trooper, nor did the records include GPS location information." (Doc. 47 at 7.)

[5] The "standard *Giglio* questions" asked were: "(1) Are you aware of any complaints, allegations of misconduct, or personnel actions currently pending against you? (2) Have there ever been any complaints, allegations of misconduct, or personnel actions made against you in the past? (3) Other than traffic offenses, have you ever been convicted of or entered any plea other than not guilty to a criminal offense?" (Doc. 50 at 8-9.)

In *Brady*, the Supreme Court held that the government is required to produce to the defense evidence "in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (citing *Brady v. Maryland*, 373 U.S. 83 (1963).) "*Brady's* materiality requirement asks whether the suppressed evidence, including impeachment evidence, could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Robinson,* 627 F. 3d 941, 952 (4th Cir. 2010) (citations and internal quotations omitted.) The government's obligation under *Brady* applies to evidence that might be used to impeach the credibility of a witness. *Giglio v. United States*, 405 U.S. 150 (1972).

Bernard's argument for a new trial assigns error to the government for failing to inform defense counsel of the evidence of Bernard's statements while at the Magistrate's office, for failing to provide the requested cellphone data, and for failing to inform defense counsel that Trooper Blanton had exited the interstate to refuel his patrol car prior to arriving at the location where Bernard had been pulled over. Bernard has not shown that the government violated *Brady* or *Giglio* and his Motion for a New Trial will be denied.

**A. Bernard's Incriminating Statements at Magistrate's Office**

Attorneys for the government had no knowledge of Bernard's incriminating statements made at the Magistrate's office until the pre-trial interview conducted on October 31, 2013. Upon receiving this evidence, the government informed defense counsel almost immediately and expressed willingness to discuss any follow-up questions posed by defense counsel. (Doc. 50 Ex. 8.)

Here, there is no violation of *Brady* or *Giglio* because as soon as the evidence came into possession of the government it was provided to the Defendant.

### B. Cell Phone Records and Trooper Blanton's Fuel Stop

    1. *Whether the Government Possessed the Evidence*

An essential element to a claim for violation of *Brady* or *Giglio* is that the government possessed the evidence improperly suppressed. *Spicer v. Roxbury Corr. Inst.*, 194 F. 3d 547, 567 (4th Cir. 1999) (citing *United States v. Beaver*, 524 F. 2d 963, 966 (5th Cir. 1975) ("*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess."))

Here, in the Correction to Responses, the government concedes that it possessed the Troopers' cell phone numbers and that the cell phone records could have been obtained from the North Carolina Highway Patrol without a court order or subpoena. (Doc. 53 at 1.) This concession by the government is based on the view that the troopers were part of the "prosecution team." (*Id.*) In the Court's view, only the prosecuting attorneys and case agent(s) responsible for the case are part of the prosecution team. The troopers were only witnesses for the government. Nevertheless, the government has conceded possession and in this scenario it is reasonable to accept that the government possessed the cell phone numbers of their own witnesses. Additionally, the government does not dispute prior knowledge of Trooper Blanton's fuel stop.

    2. *Whether the Evidence was Favorable to Bernard*

The second essential element to a claim for violation of *Brady* or *Giglio* is that the evidence improperly suppressed by the government is favorable to the accused. Here, Bernard has failed to show how the Troopers' phone records or Trooper Blanton's stop for fuel are beneficial to him.

There is no evidence that the phone records were favorable to Bernard. Defense counsel was able to obtain the phone records prior to trial but did not use them in any substantive manner or for impeachment purposes. Furthermore, Bernard has made no post trial showing of how the phone records might have been beneficial to his defense. Therefore, any benefit to Bernard is speculation which cannot be the basis for a violation under *Brady* or *Giglio*. *United States v. Paulino*, 103 F. 3d 122, 2 (4th Cir. 1996) ("[m]ere speculation that *Brady* material exists does not justify fishing expeditions in government files.") (Citing *United States v. Crowell,* 586 F. 2d 1020, 1029 (4th Cir. 1978)).

Likewise, Bernard has made no showing as to how evidence of Trooper Blanton's stop for fuel is favorable to his case. Defense counsel states that "[h]ad [I] been aware of this information, [I] would have made specific requests for [Trooper Blanton's] fuel card/gas station logs in order to verify whether or not his testimony was in fact truthful."[6] (Doc. 41 at 7.) Arguing that the fuel stop is favorable to Bernard requires the Court to assume that Trooper Blanton was dishonest about the stop. Defense counsel has failed to present any facts supporting such an assumption and therefore, the alleged suppression of evidence of Trooper Blanton's pit stop is insufficient to sustain a claim for violation of *Brady* or *Giglio*. *Paulino,* 103 F. 3d at 2.

### 3. *Whether the Evidence was Material to Bernard's Guilt or Punishment*

Finally, a claim for violation of *Brady* or *Giglio* must show that the evidence suppressed by the government is material to the guilt or punishment of the defendant. This means that the government's improper suppression of evidence was of a kind and to a degree that the Court is no longer confident in the jury's guilty verdict. *Spicer*, 194 F. 3d at 559 (finding the suppressed

---

[6] Defense counsel was aware of this information at trial and declined to inquire further at trial during cross-examination of Trooper Blanton. Although ancillary, this fact also cuts against defense counsel's necessary argument that evidence connected to Trooper Blanton's stop for fuel is in some way favorable to Bernard.

evidence in possession of the government and favorable to the accused but holding that "the prosecutor would only be required to disclose [the evidence] under *Brady* if it was "material," such that prejudice ensued from its suppression.") (Citing *Strickler v. Greene*, 527 U.S. 263, 280 (1999)).

In this case, direct evidence supporting the jury's verdict was strong. Bernard was pulled over on the interstate travelling from California to North Carolina. Upon searching Bernard's vehicle, law enforcement personnel discovered a loaded pistol in reaching distance to the driver's seat, a .22 rifle located in the rear of the vehicle, another pistol locked in a carrying case contained in the luggage located on the roof, and three plastic crates on top of the roof containing 53 mason jars with approximately one ounce of marijuana in each jar. (Doc. 52-1 at 2.) When advised by the arresting officers that he might be able to help himself out by speaking with other law enforcement officials waiting at the detention facility, Bernard responded that there was no way he could help himself out, that he had grown the marijuana himself, and that he had to do whatever he could to make money since he was unemployed. (*Id.*) This overwhelming physical evidence and admission by Bernard is not overborne by the alleged *Brady* and *Giglio* violations. *Cf. Spicer*, 194 F.3d at 559-61. (In contrast to the facts presented in this case, in *Spicer*, the Fourth Circuit held that the suppressed impeachment evidence *was material* because no physical evidence existed and eyewitness testimony was weak.)

Bernard's alleged violations of *Brady* and *Giglio* fail to undermine the Court's confidence in the jury's guilty verdict.

### III. CONCLUSION

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for a New Trial is **DENIED.** Defendant's Motion for a Hearing is **DISMISSED AS MOOT.**

Signed: June 24, 2014

*Richard L. Voorhees*
Richard L. Voorhees
United States District Judge